MARY K. WARREN (NY Reg. #2557684)
(Pro Hac Vice)
Email: mary.warren@cfpb.gov
Phone: (202) 435-7815
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington, DC 20552
Fax: (202) 435-7722

OWEN MARTIKAN, CA Bar #177104 - Local Counsel
301 Howard St., Suite 1200
San Francisco, CA 94105
Phone: (415) 844-9790
Email: owen.martikan@cfpb.gov

Attorneys for Plaintiff
Bureau of Consumer Financial Protection

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection,<br><br>Plaintiff,<br><br>v.<br><br>Performance SLC, LLC, Performance Settlement, LLC and Daniel Crenshaw,<br><br>Defendants. | SACV 20-cv-02132-DOC(DFMx)<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION AND CIVIL MONEY PENALTIES** |

## Introduction

1.      The Bureau of Consumer Financial Protection ("Bureau") brings this action against Performance SLC, LLC, Performance Settlement, LLC, and Daniel Crenshaw under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c), 6105(d); the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310; and the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565, in connection with the marketing and sale of debt-relief services by Defendants.  This Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2.      Defendants Performance SLC, LLC and Performance Settlement, LLC, along with their owner and manager Defendant Daniel Crenshaw, are engaging in debt-relief activities that have harmed consumers nationwide by charging illegal advance fees, failing to make required disclosures, and engaging in deceptive sales practices.

3.      The Bureau brings this action to stop Defendants' unlawful conduct, obtain relief for harmed consumers, and impose civil money penalties on Defendants for their unlawful actions.

## Venue

4.      Venue is proper in this district because each Defendant is located, resides, or does business in this District. 12 U.S.C. § 5564(f).

## Parties

5.      The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). It has independent litigating authority and may secure appropriate relief for violations of the CFPA, 12 U.S.C. § 5564(a)-(b), and for violations

of the TSR with respect to consumer financial products or services subject to the CFPA, 15 U.S.C. §§ 6102(c), 6105(d).

6. Performance SLC, LLC ("PSLC"), a California limited liability company, has operated out of 3200 Park Center Dr., 15th Floor, Costa Mesa, CA, 92626; 3080 Bristol Street, Costa Mesa, CA, 92626; 17748 Sky Park Circle, Irvine, CA, 92614; 15310 Barranca Parkway, Irvine, CA, 92618; and 2445 McCabe Way, Irvine, CA, 92614. At all times material to this Complaint, PSLC has advertised, marketed, promoted, offered for sale, sold, and provided financial advisory services in the form of debt-settlement services, in particular student-loan debt-relief services, to consumers throughout the United States.

7. Performance Settlement, LLC ("PSettlement"), a California limited liability company, maintains its principal place of business at 675 Anton Blvd, Costa Mesa, CA, 92626. At all times material to this Complaint, PSettlement advertised, marketed, promoted, offered for sale, sold, or provided financial advisory services in the form of debt-settlement services to consumers throughout the United States.

8. Daniel Crenshaw ("Crenshaw") is the sole owner and CEO of PSLC, and is the CEO and controlling owner of PSettlement. Crenshaw resides in Newport Beach, California.

### PSLC's Business Practices

9. PSLC was a student-loan document-preparation and debt-relief service. It prepared and submitted paperwork for consumers to the U.S. Department of Education ("ED") in support of applications for loan consolidation, income-driven repayment plans, forgiveness programs, and other debt-relief options available to consumers with federal student loans. It also submitted recertification paperwork to ED for one or two years after a consumer's application for repayment programs was accepted.

10.     ED does not charge federal student loan borrowers to submit applications to participate in loan consolidation, income-driven repayment plans, forgiveness programs, and other debt-relief programs or to submit recertification paperwork for those programs.

11.     Formed in late 2015, PSLC solicited and signed up consumers nationwide by telephone, using lead generators to transfer consumer phone calls to PSLC's sales staff.

12.     PSLC collected a fee for its services in two ways: (1) by way of a loan provided to PSLC's customers by a third-party finance company, Equitable Acceptance Corporation ("EAC"), and (2) by requiring its customers to make monthly installment payments of the fee into trust accounts established for that purpose. Under both payment methods, PSLC requested or received payment of its fee in advance of consumers making any payments on loan consolidations or modifications that PSLC obtained for them.

13.     The first way that PSLC charged its fee was through financing. From late 2015 through 2017, PSLC partnered with EAC, an indirect finance company that enters into contracts with businesses to offer and provide credit to customers of those businesses to pay for services.

14.     Pursuant to an agreement with PSLC, EAC extended credit in the form of a high-interest loan to many of PSLC's customers, on a case-by-case basis, to pay for PSLC's services. For these customers, PSLC's fee (not including the interest on the loan) was $1,450.

15.     During PSLC's sales calls with a consumer to pitch enrollment in PSLC's program, the PSLC sales agent would request the $1,450 fee and offer the consumer a loan from EAC to cover the fee if he or she met certain creditworthiness requirements. PSLC used an electronic portal connected to EAC to enter the consumer's financial information and determine whether the consumer met EAC's requirements. If the consumer agreed to the financing, the sales agent would electronically provide the consumer with the PSLC contract and the EAC loan agreement (or cause EAC to provide

FIRST AMENDED COMPLAINT

4

the loan agreement by means of the portal) and require the consumer to e-sign both documents while on the call.

16.     When they signed the EAC loan agreement, these consumers ("Loan Customers") became obligated on the loan at the inception of their relationship with PSLC.

17.     The EAC loan financed PSLC's $1,450 service fee with an annual percentage rate that was typically between 17% and 22% and a term of three years. The effective interest rate was higher due to compounding.  Thus, Loan Customers were charged hundreds of dollars in addition to PSLC's stated $1,450 fee.

18.     Some Loan Customers were required to make a $200 cash deposit into a trust account as a down payment on PSLC's fee, and to finance the remaining $1,250.

19.     EAC paid PSLC a portion of the $1,450 service fee within two weeks of a Loan Customer signing the loan document at enrollment, holding a certain percentage back in reserve depending on its assessment of the risk that the customer would default. Typically, EAC's initial payment to PSLC was 40-60% of the $1,450 fee.

20.     The EAC loan would appear on Loan Customers' credit histories.  After signing the EAC loan agreement,  Loan Customers were expected to make monthly payments of principal and interest to EAC for three years, typically in the amount of $40 to $50 per month.

21.     Some Loan Customers were confused about the loan payments to EAC, believing that the money was going to pay their student debt and that at the end of the three-year term of the loan, their student debt would be forgiven.

22.     The second way PSLC charged its fee was by directing customers to pay by monthly installments into a dedicated trust account with a third-party trust account provider.  The duration of the payment schedule and the amount of the monthly payment varied, but these customers ("Trust Plan Customers") were generally charged a fee ranging from $1,000 to $1,450.

23.     PSLC required that Trust Plan Customers make the initial monthly payment on the day of enrollment or within a few days of enrollment.  Some Trust Plan Customers chose a payment schedule consisting of larger installments paid monthly for a period less than a year, while others chose a payment schedule of smaller installments paid monthly for 12 to 18 months.

24.     PSLC established trust accounts for its customers for no other purpose than the payment of fees.  In addition to making payments toward PSLC's fee, Trust Plan Customers also were required to pay a monthly banking fee of $6 to the third-party administrator of the trust accounts.  Some Trust Plan Customers paid additional amounts in banking fees and fees to the third-party trust administrator, such as when a payment was declined for insufficient funds.  Trust Plan Customers paid at least $150,000 in such additional charges.

25.     PSLC's practice has been to take the amounts accrued in a Trust Plan Customer's trust account after the consolidation or other loan modification was approved by ED but before the Trust Plan Customer had made any payment under the consolidation or loan modification.

26.     PSLC did not provide Trust Plan Customers with any documentation that included a disclosure informing those customers that they owned the funds in their trust accounts and could withdraw them at any time without penalty.

27.     PSLC terminated the relationship with EAC in late 2017. But as of February 2020, nearly 1,300 Loan Customers were still obligated on their loans to EAC.

28.     From 2016 to 2019, PSLC enrolled more than 6,500 customers in multiple states.  From 2016 to late 2019, Trust Plan Customers paid more than $4,300,000 in fees to PSLC.  From 2016 to early 2020, Loan Customers paid more than $4,900,000 in loan principal and interest to EAC.

29.     PSLC ceased enrolling new consumers in 2019, although it continued to collect fees from Trust Plan Customers in 2019 and 2020.  PSLC ceased operations in 2020.

30.     Crenshaw, as the sole owner and CEO of PSLC, participated in decisions, policies, and practices relating to the manner and timing in which fees were charged to and collected from both Loan Customers and Trust Plan Customers.  Crenshaw was responsible for the arrangement with EAC.  He signed the contract with EAC and communicated directly with the top management of EAC concerning loans to Loan Customers, payments from EAC to PSLC, and EAC's financing model.  Crenshaw provided the information for the application that initiated PSLC's relationship with the third-party trust administrator, which enabled the Trust Plan Customers' accounts to be established.  He communicated directly with the manager of the trust administrator.

31.     As the sole owner and CEO of PSLC, Crenshaw exercised control over the company.  He oversaw all managers at PSLC and participated in the company's day-to-day business operations.  He opened and was a signatory on the company's bank accounts.

32.     Crenshaw knew about or was recklessly indifferent to the manner and timing in which fees were charged to customers.  He knew or was recklessly indifferent to the fact that Loan Customers became obligated at enrollment to pay EAC.  He knew or was recklessly indifferent to the fact that PSLC was requiring Trust Plan Customers to make monthly fee payments into trust accounts beginning at or just after enrollment. He reviewed payment reports and oversaw collections.  Crenshaw reviewed customer complaints that discussed the fees and the EAC loans.

33.     In January 2016, at the very early stages of PSLC's existence, PSLC's legal counsel warned Crenshaw about the timing of the company's fees.  In an email to Crenshaw, he stated: "the consumer CAN'T owe or be obligated to anyone until the [student loan] debt is consolidated and a payment is made to the DOE [ED]."

## PSettlement's Telemarketing Practices

34.     PSettlement is a consumer debt-settlement company that Crenshaw formed and began operating in 2015.  PSettlement charges a fee of 25% of a customer's enrolled debt to negotiate settlements of the debt.

35.     PSettlement solicits and signs up consumers in multiple states by telephone, using lead referral services to transfer consumer phone calls to PSettlement's sales staff.

36.     One such lead referral company is OneLoanPlace.com ("OLP"), which has described itself as a "loan matching service" for consumers.  OLP is not a lender and does not provide loans itself.  As of 2019, based on records of PSettlement's commission payments to its lead generators, at least 3,000 of PSettlement's referrals came from OLP.

37.     Under its contract with PSettlement, OLP refers "Qualifying Customers" to PSettlement.  "Qualifying Customers" are consumers residing in certain states "with greater than $10,000 in unsecured debt, who have been determined by [OLP] agents to be viable candidates for [PSettlement]'s debt resolution services in [OLP]'s sole discretion."  In return, PSettlement pays OLP a commission calculated as a percentage of any fee that PSettlement collects from a referred consumer who enrolls in PSettlement's debt resolution program.

38.     One way OLP refers consumers to PSettlement is through an online questionnaire for consumers who are seeking a personal or debt consolidation loan.  OLP's questionnaire asks about the consumer's credit score, the size of the loan that he or she is seeking, and other financial information.  After certain consumers submit the questionnaire, OLP sends them an email stating "we matched you with our partner, Performance" – omitting the "Settlement" part of its name – and giving contact information for OLP and "Performance."  OLP also puts consumers in touch with PSettlement via live call transfers of consumers looking for a loan.

39.     Even though these consumers are seeking loans and PSettlement is not a lender, PSettlement's sales pitch misleadingly discusses the prospect of a loan.

40.     After a referral by OLP, PSettlement first solicits the consumer to provide his or her personal and financial information by telling the consumer:

> We know that the loan process can be a difficult one and I'm glad you called let [sic] me see what we can do for you.  So, what I'm going to do is collect as much information as possible and send it over to my underwriting department and they'll come back on the line with results and let you know what you ultimately may or may not qualify for.

41.     After this introduction, the PSettlement salesperson, referred to as a "debt specialist," obtains information about the consumer's debts, income, and any hardship conditions, and obtains the consumer's permission to pull the consumer's credit report.

42.     Then the salesperson states that he or she is transferring the consumer to an "underwriter" or "senior underwriter."  The "underwriter" that the salesperson transfers the consumer to is another employee of the sales department.  There is no "underwriter" position at PSettlement.

43.     The "underwriter" tells the consumer that PSettlement will "underwrite" the consumer for three options:  a loan, a debt-resolution program, or bankruptcy.  Neither the "underwriter" nor PSettlement has any training or expertise in bankruptcy, nor does PSettlement provide any bankruptcy services.

44.     The next step is for the "underwriter" to put the consumer on mute for two minutes.  After the two minutes, the "underwriter" takes the phone off mute to tell the consumer that the loan was declined:

> Ok It looks like we weren't approved for the loan because the debt to income ratio is too high. I even tried a smaller amount with [OLP] and still was declined, and remember they are like Lending Tree so they shopped this with all the unsecured lenders not just one and unfortunately this is not an option.

45.     PSettlement's sales scripts contain no instructions for contacting OLP or anyone else to help the consumer obtain a loan.  PSettlement's sales scripts contain no scenario in which the consumer is approved for a loan.

46.     After telling the consumer that he or she was not approved for a loan, the PSettlement "underwriter" then states:

> The good news is we did get a PREAPPROVAL for the debt resolution program due to a DTI over 60%. The GREAT news is IF we can get your [sic] approved for this program this is the right fit as the total pay back is roughly 65-75% of what you owe, which would save you thousands and give you the peace of mind that comes with being free of these debts.

47.     The "underwriter" moves on to pitch PSettlement's services and persuade the consumer to electronically sign PSettlement's service contract during the phone call. PSettlement uses the consumer's personal and financial information that it collected as part of the purported loan qualification process to steer them to sign up for PSettlement's services.  PSettlement's sales scripts also counsel the "underwriter" on how to "educate" the consumer if the consumer continues to press for a loan.

48.     Consumers have no way of knowing that PSettlement is not in fact assisting them to obtain a loan during the sales call.

49.     In addition, after telling consumers they were denied for a loan, the "underwriter" tells the consumer about the possibility of a "fresh start" loan from another company that they could "become eligible for" if they sign up for PSettlement's program and make six consecutive deposits into their trust accounts.  PSettlement tells consumers:

> The Fresh Start program is definitely a powerful financial tool, but in order to be eligible to apply with our partner, you need to begin with our Debt Resolution Program first.

50.     PSettlement's representation, after it has told consumers that they were not approved for a loan, that it was possible for them to become eligible to obtain a loan on the condition that they enrolled in PSettlement's program and made certain payments, reinforce a reasonable belief by consumers that PSettlement could obtain a loan for them, but only if they first enrolled in PSettlement's debt-resolution program.

51.     The scripts that contain these representations were in use from at least May 2019.  Two versions of the script, dated May 2019 and August 2019 respectively, contain nearly identical language to that quoted above.   In addition, it is likely that similar scripts were in use earlier than May 2019, as PSettlement had a marketing arrangement with OLP prior to May 2019 and the two versions of the script were labeled "v.7" and "v.9", indicating that they were version 7 and version 9 of the same script.

52.     Crenshaw is the controlling owner and CEO of PSettlement. Crenshaw oversees all managers at PSettlement, was involved in creating PSettlement's policies and procedures, and regularly monitored the company's sales and customer trust accounts. He opened PSettlement's bank accounts, is a signatory on the accounts, and approves disbursements from the accounts.

53.     Crenshaw has participated in PSettlement's sales pitch for leads referred by OLP.  He manages PSettlement's relationships with lead referral services in general and signed PSettlement's contract with OLP in particular.

54.     Crenshaw has overseen and is aware of the sales scripts and practices of the sales department at PSettlement.  He has the authority to make and has made changes to scripts used in connection with leads generated by OLP.

55.      Crenshaw has known or has been recklessly indifferent to the fact that PSettlement's sales practices include deceiving consumers by pretending to try to help them obtain a personal loan, when in reality PSettlement does nothing to help them obtain a loan at the point of sale or enrollment and instead uses their personal and financial information to steer them to sign up for PSettlement's services.

**PSettlement's Settlement Preauthorization Form**

56.     While on the phone with potential customers, PSettlement's sales staff pitches PSettlement's services and asks the consumer to e-sign PSettlement's service contract and certain attached documents during the sales call.

57.     One of the documents attached to the service contract is entitled "Preauthorization Settlement Form." It states:

> I/we, [consumer name], authorize Performance Settlement, LLC, to settle any accounts with an offer **less than or equal to 60%** of the enrolled balance.  This authorizes Performance Settlement, LLC to arrange for payment from my/our trust account to creditor without written authorization and/or recorded settlement authorization.  Any settlement offers made above 60% of the enrolled balance must receive my/our written and/or recorded authorization.

58.     To enroll with PSettlement, the consumer is required to sign this document along with PSettlement's service contract.  Therefore, consumers sign the Preauthorization Settlement Form at the outset of their business relationship with PSettlement and before PSettlement has renegotiated or settled any of the consumers' debts.

59.     From 2015 through at least 2019, PSettlement has relied on the preauthorization form to agree, on consumers' behalf, to settlements for 60 percent or less of the consumer's enrolled balance without the consumer executing or authorizing the specific settlement agreements.

**VIOLATIONS OF THE TSR BY PSLC, PSETTLEMENT AND CRENSHAW**

60.     The Bureau is authorized to enforce the Telemarketing Act and the TSR with respect to the offering or provision of a consumer financial product or service subject to the CFPA. 15 U.S.C. § 6105(d).  Among other things, a consumer financial product or service is defined by the CFPA to include "providing financial advisory

services…including…providing services to assist a consumer with debt management or debt settlement [or] modifying the terms of any extension of credit…." 12 U.S.C. § 5481(15)(viii)(II).

61.    The TSR defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector." 16 C.F.R. § 310.2(o).

62.    The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd).

63.    The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer…." 16 C.F.R. § 310.2(ff).

64.    The TSR defines "telemarketing" in relevant part as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

65.    PSLC and PSettlement are each a telemarketer within the meaning of the TSR that engaged in telemarketing of debt-relief services to consumers.  Both PSLC's and PSettlement's marketing of their services was done via telephone by the company's sales representatives.  The use of the telephone was part of a "plan, program, or campaign" to sell both PSLC's and PSettlement's services, and involved more than one phone and more than one interstate phone call.  Consumers who spoke to sales representatives of PSLC and PSettlement were located in a number of different states outside of California, where PSLC and PSettlement are located.

66.     PSLC is a seller under the TSR because, in connection with its telemarketing, it offered to provide, and did provide, services related to federal student-loan debt in exchange for a fee.  Those services were debt-relief services under the TSR because PSLC represented it would settle, renegotiate, or alter the terms of repayment or other terms of consumers' federal student-loan debt.

67.     PSettlement is a seller under the TSR because, in connection with its telemarketing, it offered to provide, and did provide, debt negotiation and debt settlement services in exchange for a fee.  Those services were debt-relief services under the TSR because PSettlement represented it would settle, renegotiate, or alter the amount or terms of repayment of consumers' unsecured debts.

## **Count I**

*Violations of the TSR by PSLC and Crenshaw*

*(Requesting and Receiving Advance Fees)*

68.     The Bureau re-alleges and incorporates by reference paragraphs 1-3, 5, 6, 8, 9-33, and 60-66.

69.     It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service to request or receive payment of any fee or consideration for any debt-relief service until and unless: (1) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (2) the customer has made at least one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i).

70.     PSLC is a seller and telemarketer that provided, offered to provide, or arranged for others to provide debt-relief services.

71.     With respect to Loan Customers, PSLC requested fees at the time of enrollment in its program by requiring Loan Customers to sign a loan agreement to finance payment of PSLC's fee at enrollment, before their student loan debt was consolidated or otherwise modified or they had made one payment on that altered debt.

72.     With respect to Loan Customers, PSLC received a disbursement from EAC of a significant portion of its $1,450 fee within two weeks of their enrollment, before their student loan debt was consolidated or otherwise modified or they had made one payment on that altered debt.

73.     With respect to Loan Customers who were required to deposit $200 in a trust account at enrollment as a down payment on PSLC's services and financed the remainder of the fee, PSLC requested fees before those customers' student loan debt was consolidated or otherwise modified or they had made one payment on that altered debt.

74.     With respect to Trust Plan Customers, PSLC required them to deposit monthly installment payments that were exclusively comprised of PSLC's fee into a dedicated trust account beginning at or soon after enrollment, thus requesting or receiving fees before those customers' student-loan debt was consolidated or otherwise modified or they had made one payment on that altered debt.

75.     PSLC took the fees from Trust Plan Customers' dedicated accounts at the time the terms of their debts were altered, but before those customers had made one payment on that altered debt.

76.     By the methods described above in paragraphs 9-33, PSLC requested or received fees from its customers before PSLC had renegotiated, settled, reduced, or otherwise altered the terms of their debts pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customers, and before its customers had made one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement between the customer and the creditor or debt collector.

77.     Crenshaw participated in PSLC's requesting and receiving of fees in this way.  He was responsible for the contract and relationship with EAC and set up the arrangement with the trust administrator to have PSLC's customers pay fees into trusts.

78.     Crenshaw, as the CEO and sole owner of the company, had the authority to control PSLC's use of telemarketing and the manner and timing of its requests for and receipt of fees.

79.     Crenshaw knew about or was recklessly indifferent to the fact that PSLC was engaged in telemarketing and the manner and timing of its requests for and receipt of fees.

80.     Therefore, PSLC and Crenshaw have engaged in abusive telemarketing acts or practices in violation of 16 C.F.R. § 310.4(a)(5).

## **Count II**

*Violations of the TSR by Crenshaw*

*(Substantial Assistance to PSLC in its Violations of the TSR as to Advance Fees)*

81.     The Bureau re-alleges and incorporates by reference paragraphs 1-3, 5, 6, 8, 9-33, and 60-66.

82.     The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

83.     PSLC is a seller and telemarketer that provided, offered to provide, or arranged for others to provide debt-relief services.

84.     In the course of offering to provide or providing a debt-relief service to consumers, PSLC requested and received fees before PSLC had renegotiated, settled, reduced, or otherwise altered the terms of its customers' debts pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customers and before the customers had made one payment pursuant to that settlement agreement, debt-management plan, or other valid contractual agreement

between the consumers and the creditor or debt collector. Thus, PSLC engaged in abusive acts or practices in violation of the TSR.   16 C.F.R. § 310.4(a)(5).

85.   Crenshaw, as sole owner and CEO of PSLC, provided substantial assistance or support to PSLC by, among other things, overseeing all managers at PSLC and participating in the company's day-to-day business operations.   For example, he was a signatory on the company's bank accounts, managed its relationship with EAC, and participated in the process of setting up and managing the arrangement with the trust account administrator to provide trust accounts for Trust Account Customers.

86.   Crenshaw knew or consciously avoided knowing that PSLC was engaged in telemarketing and that PSLC was requesting and receiving fees from customers before it altered the terms of those consumers' debt or they had made one payment on that altered debt.

87.   Crenshaw has violated the TSR's ban on assisting and facilitating others' violations of that rule. 16 C.F.R. § 310.3(b).

## Count III

### Violations of the TSR by PSLC

### (Failure to Clearly and Conspicuously Disclose Consumers' Rights to Funds)

88.   The Bureau re-alleges and incorporates by reference paragraphs 1-3, 5, 6, 9-18, 22-26, and 28-29, and 60-66.

89.   It is a violation of the TSR for any seller or telemarketer in connection with the sale of any debt-relief service requiring customers to place funds in an account at an insured financial institution to fail to disclose truthfully, in a clear and conspicuous manner, before customers consent to pay for those services, that customers own the funds held in the accounts, that customers may withdraw from the debt-relief service at any time without penalty, and that, if customers withdraw, they must receive all funds in the accounts other than funds earned by the debt-relief service. 16 C.F.R. § 310.3(a)(1)(viii)(D).

90.     PSLC required Trust Plan Customers to place funds in an account at an insured financial institution.

91.     PSLC did not clearly and conspicuously disclose that Trust Plan Customer owned the funds in their trust accounts and that if they withdrew from its program, the customer must receive all funds in the account, less fees earned by PSLC.

92.     PSLC's failure to disclose in a clear and conspicuous manner that Trust Plan Customers owned the funds in their trust accounts and that those who cancelled their service contract with PSLC would receive all funds in their trust accounts was a deceptive act or practice in telemarketing, in violation of the TSR. 16 C.F.R. § 310.3(a)(1)(viii)(D).

## Count IV

*Violations of the TSR by PSettlement*

*(Failure to Comply with Requirement that Consumer Execute Settlement Agreement)*

93.     The Bureau re-alleges and incorporates by reference the allegations in paragraphs 1-3, 5, 7, 34-35, 56-65, and 67.

94.     The TSR prohibits a seller or telemarketer of debt-relief services from "[r]equesting or receiving payment of any fee or consideration for any debt relief service unless: (A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt *pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer*…." 16 C.F.R. § 310.4(a)(5)(i)(A) (emphasis added).

95.     In the preamble to the amendments to the TSR implementing the provisions relating to debt-relief services, the Federal Trade Commission stated that "[a] contract signed at the outset specifying, for example, that any offer that involves the payment of a certain amount will be deemed acceptable to the consumer *is not sufficient to comply with the Rule*." Telemarketing Sales Rule, 75 Fed.Reg. 48458, 48489 (August 10, 2010) (emphasis added).

96.     PSettlement has relied on the preauthorization forms that it has caused consumers to sign at the outset of their retention of PSettlement as authority to settle any accounts with an offer less than or equal to 60 percent of the enrolled balance without review by the customer of the specific settlement agreement or proposal and without separate written approval or a recorded settlement authorization from the customer.

97.     Therefore, PSettlement has engaged in abusive telemarketing acts or practices in violation of 16 C.F.R. § 310.4(a)(5).

## DEFENDANTS' VIOLATIONS OF THE CFPA

98.     Section 1036(a)(1)(A) of the CFPA provides that it is "unlawful for any covered person to offer or provide to a consumer a financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

99.     PSLC and PSettlement are covered persons because they offer or provide consumer financial products or services, namely financial advisory services to assist consumers with modifying the terms of any extension of credit, including by debt settlement. 12 U.S.C. §§ 5481(6), (15)(A)(viii)(II).

100.    Under the CFPA, a "related person" is a covered person. 12 U.S.C. § 5481(25)(B).  Crenshaw is a related person with respect to both PSLC and PSettlement, as he is an "officer … charged with managerial responsibility for, or controlling shareholder of" both PSLC and PSettlement. 12 U.S.C. § 5481(25)(C)(i). Therefore, Crenshaw is a covered person.

### **Count V**

*Violations of the CFPA by PSettlement and Crenshaw*

*(Deceptive Acts and Practices)*

101.    The Bureau re-alleges and incorporates by reference paragraphs 1-3, 5, 7-8, 34-55, and 98-100.

102.   It is unlawful for any covered person or service provider to engage in a deceptive act or practice in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

103.   An act or practice is deceptive if it involves a material representation that is likely to mislead consumers acting reasonably under the circumstances. A representation is considered material if it involves information that is important to consumers and therefore is likely to affect their choice of, or conduct regarding, a product.

104.   Starting from at least May 2019, in connection with PSettlement's telemarketing campaign of debt-resolution services to consumers referred by OLP, PSettlement has represented, expressly or by implication, to consumers that:

      a.   OLP has referred the consumer to PSettlement because PSettlement may be able to help the consumer obtain a loan;

      b.   PSettlement is "underwriting" or "qualifying" the consumer for a loan;

      c.   PSettlement is collecting the consumer's personal and financial information to help the consumer obtain a loan; and

      d.   the consumer was turned down for a loan (i) after PSettlement's "underwriter" took the consumer's personal and financial information and determined the consumer did not qualify for a loan, and/or (ii) after PSettlement "tried a smaller amount with" OLP.

105.   In truth and in fact:

      a.   OLP refers consumers to PSettlement after determining they are candidates for debt resolution;

      b.   PSettlement is not and has never been a lender, and there is not and has never been an "underwriter" position at PSettlement;

c. PSettlement uses the consumers' personal and financial information that it has collected under the auspices of evaluating them for a loan to steer them to sign up for PSettlement's services; and

d. PSettlement does not, as a general practice, make any attempt to secure a loan for a consumer before telling the consumer the loan was declined and pitching the consumer to sign up for its debt-resolution program.

106.    These misrepresentations are material and are likely to mislead consumers acting reasonably under the circumstances.

107.    Crenshaw, as controlling owner and CEO of PSettlement, has participated and engaged in the deceptive practices.  He is primarily responsible for instituting and managing PSettlement's marketing relationships, including with OLP.  He has directly contributed to the development and approval of materials containing the deceptive statements by overseeing and making changes to the sales scripts that PSettlement used with consumers referred by OLP.

108.    Therefore, PSettlement and Crenshaw have engaged in deceptive acts or practices in connection with the offering of a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## **Count VI**

*Violations of the CFPA by Crenshaw*

*(Substantial Assistance to PSettlement)*

109.    The Bureau re-alleges and incorporates by reference paragraphs 1-3, 5, 7-8, 34-55, and 98-108.

110.    Under the CFPA, it is unlawful for any person to "knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 1031…." 12 U.S.C. § 5536(a)(3).

111.    As described in Count V, PSettlement has engaged in deceptive acts and practices in violation of §§ 1031(a) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

112.    Crenshaw has provided substantial assistance to PSettlement in this conduct.

113.    As the controlling shareholder and CEO of PSettlement, he has associated himself with the venture.

114.    As controlling shareholder and CEO of PSettlement, Crenshaw has participated in PSettlement's sales efforts as something that he wished to bring about and that he sought by his actions to make succeed.  He is primarily responsible for instituting and managing PSettlement's marketing relationships, including with OLP.  He signed the lead referral contract with OLP.

115.    Crenshaw has knowingly or recklessly provided substantial assistance to PSettlement's deceptive sales practices.  He has directly contributed to the development and approval of materials containing the deceptive statements by overseeing and making changes to the sales scripts that PSettlement used with consumers referred by OLP, and therefore he was aware of their contents and their deceptive nature.

116.    Therefore, Crenshaw has substantially assisted PSettlement in engaging in deceptive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

## Count VII

### *Violations of the CFPA by PSLC, PSettlement and Crenshaw*
### *(CFPA Violations Based on Violations of the TSR)*

117.    The Bureau re-alleges and incorporates by reference paragraphs 1-3, 5, 6, 8, 9-33, and 56-97.

118.    Any act or omission in violation of a federal consumer financial law by a covered person is a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

119.    The TSR is a federal consumer financial law as defined by the CFPA. 12 U.S.C § 5481(14); 15 U.S.C § 6105(d).

120.   Therefore, the violations of the TSR by PSLC, PSettlement, and Crenshaw described in Counts I through IV constitute violations of section 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## DEMAND FOR RELIEF

WHEREFORE, the Bureau requests, under 12 U.S.C. § 5565, that the Court:

 a. Impose appropriate injunctive relief against Defendants for their violations of the TSR and the CFPA;

 b. grant additional injunctive relief as the Court may deem to be just and proper;

 c. award monetary relief against Defendants including but not limited to the refund of monies paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

 d. award the Bureau civil money penalties;

 e. award the Bureau the costs of bringing this action; and

 f. award such other and additional relief as the Court may determine to be just and proper.

Dated: July 6, 2021

        Respectfully submitted,


        /s/ Mary K. Warren

        Mary K. Warren (*pro hac vice*)
        *Senior Litigation Counsel*
        Bureau of Consumer Financial Protection
        1700 G St., NW
        Washington, DC 20552

        Owen Martikan
        Local Counsel

1   Telephone Warren: (202) 435-7815
    Email: mary.warren@cfpb.gov
2   Telephone Martikan: (415) 844-9790
    Email: owen.martikan@cfpb.gov
3

4

5   *Attorneys for Plaintiff Bureau of Consumer*
    *Financial Protection*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28